MARK BRNOVICH
Attorney General

Patrick J. Boyle, No. 031674
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Telephone:    (602) 542-1645
Fax:              (602) 542-7670
E-mail:        patrick.boyle@azag.gov

*Attorneys for Defendant Gordon*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Fredrick A. Miller, | |
| Plaintiff, | No. CV21-01867-PHX-DGC (ESW) |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Gordon, | |
| Defendant. | |

Defendant Gordon through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, move for summary judgment.  This Motion is supported by the following Memorandum of Points and Authorities and Defendants' concurrently filed Statement of Facts ("DSOF").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      Introduction.**

This case involves Plaintiff, Fredrick A. Miller, #262220, who is an inmate in the custody of the Arizona Department of Corrections Rehabilitation and Reentry ("ADCRR").  (Doc. 1.)  Miller alleges that Defendant Gordon violated his Eighth Amendment rights by using excessive force against him on August 4, 2021.  Miller seeks compensatory and punitive damages.

## II.     Factual Summary.

### ADCRR Grievance Procedure

Department Order ("DO") 802, *Inmate Grievance Procedure*, governs the inmate grievance procedure.  (DSOF ¶ 1.)  ADCRR has an inmate grievance procedure which "is designed to address inmate complaints related to any aspect of institutional life or condition of confinement which directly and personally affects the inmate grievant, including written instructions, procedures, and the actions of the staff."  (*Id.* ¶ 2.)  DO 802 provides that pursuant to the Prison Litigation Reform Act ("PLRA"), an inmate must completely exhaust ADCRR's internal grievance and administrative process prior to filing any complaint with any state board or federal court.  (*Id.* ¶ 3.)  Inmates may utilize the Inmate Grievance Procedure regardless of their disciplinary status, housing or classification.  (*Id.* ¶ 4.)

Unless notified of an extension of time frames, expiration of any time limit for a response at any stage in the process shall entitle the inmate grievant to move to the next step in the process.  (DSOF ¶ 5.)  Extensions at any step shall not exceed 15 workdays. (*Id.* ¶ 6.)  If an inmate does not receive a response within the time period specified, his/her time to proceed to the next stage is the same as if he/she had received a response. (*Id.* ¶ 7.)  The time to proceed to the next stage begins to run the day after a response was due back.  (*Id.* ¶ 8.)  The maximum length of time for completion of the grievance process is 120 days from initiation of the Formal Grievance Process.  (*Id.* ¶ 9.)

Inmates receive a written and oral explanation of the Inmate Grievance Procedure at Reception Centers Intake and as part of the orientation process in any subsequent facility.  (DSOF ¶ 10.)  An inmate shall attempt to resolve their complaints through informal means, including, but not limited to, discussion with staff in the area most responsible for the complaint of through the submission of an Inmate Informal Complaint Resolution.  (*Id.* ¶ 11.)  In the event the complaint is unable to be resolved informally, the inmate may submit an Informal Complaint on an Inmate Informal Complaint Resolution form to the CO III in their respective unit.  (*Id.* ¶ 12.)  The

1    Informal Complaint must be submitted within 10 workdays from the date of the action

2    that caused the complaint.  (*Id.* ¶ 13.)  The CO III attempts to investigate and resolve the

3    complaint informally, and provides a response within 15 workdays of its receipt.  (*Id.* ¶

4    14.)

5        Inmates may file a Formal Grievance if they are dissatisfied with the Inmate

6    Informal Complaint Response.  (DSOF ¶ 15.)  If an inmate is unable to resolve a non-

7    medical complaint informally, the inmate may submit a Formal Grievance to the unit CO

8    IV Grievance Coordinator within five workdays from the receipt of a response from the

9    CO III.  (*Id.* ¶ 16.)  An inmate must place only a single complaint on a single Inmate

10   Grievance form.  (*Id.* ¶ 17.)  If the inmate includes multiple unrelated issues on a single

11   form or submits a duplicate complaint, the submission of the grievance shall be rejected

12   and returned to the inmate as unprocessed.  (*Id.* ¶ 18.)  The inmate shall submit the

13   Inmate Grievance form to the unit CO IV Grievance Coordinator who then logs and

14   assigns a number to the grievance, using the Unit Coordinator Grievance Log.  (*Id.* ¶

15   19.)  Within 15 workdays following the receipt of the formal inmate grievance, the

16   Deputy Warden issues a written response to the inmate.  (*Id.* ¶ 20.)

17       If the inmate receives an unfavorable response from the Deputy Warden, the

18   inmate may appeal the response to the Director within five workdays of receipt of the

19   Formal Inmate Grievance Response from the Deputy Warden.  (DSOF ¶ 21.)  The

20   inmate submits the Appeal to the CO IV Grievance Coordinator who logs, processes,

21   and forwards all documents to the Central Office Appeals Officer within five workdays

22   of receiving the Inmate Grievance Appeal from the inmate.  (*Id.* ¶ 22.)  An inmate may

23   not file an appeal to the Director until the grievance procedure within the inmate's

24   assigned unit and institution has been exhausted.  (*Id.* ¶ 23.)  Within 30 calendar days,

25   the Central Office Appeals Officer prepares a response and submits it to the Director or

26   Director's designee for signature.  (*Id.* ¶ 24.)  The Director's response is final and

27   constitutes exhaustion of all remedies with ADCRR for standard grievances.  (*Id.* ¶ 25.)

28       The CO IV Grievance Coordinator at each unit and Appeals Officer at the Central

3

1    Office shall maintain all Inmate Grievance records to include "unprocessed grievances"

2    in a confidential and secure storage area.  (DSOF ¶ 26.)  Prior to returning unprocessed

3    Informal Complaints, Formal Grievances or Appeals, Grievance Coordinators shall

4    annotate on the document the specific reason for the rejection.  (*Id.* ¶ 27.)  A grievance

5    can be returned as unprocessed if the inmate did not submit the grievance within the

6    timelines required by DO 802.  (*Id.* ¶ 28.)

7                                   **August 4, 2021**

8         Defendant Gordon was a CO II Arizona State Prison Complex Eyman Special

9    Management Unit ("SMU") from November 2017 until June 2022.  (DSOF ¶ 42.)

10   SMU was constructed as a maximum custody unit.  (*Id.* ¶ 43.)  Maximum custody

11   inmates represent the highest risk to the public and staff.  (*Id.* ¶ 44.)  Miller was

12   classified as a maximum custody inmate in August of 2021.  (*Id.* ¶ 45.)  Inmates in

13   maximum custody require controlled movement at all times and are not free to gather

14   with other inmates in areas such as educational rooms, libraries, recreation areas or

15   multipurpose rooms.  (*Id.* ¶ 46.)

16        All inmate movement in maximum custody is controlled, which means the

17   inmate is restrained and escorted by a correctional officer at all times outside of the

18   cell.  (DSOF ¶ 47.)  Proper procedure for moving an inmate in maximum custody is to

19   direct the inmate to place their hands in the small opening, or "trap" of the cell door to

20   be restrained.  (*Id.* ¶ 48.)  The cell door is not open until the inmate is properly

21   restrained.  (*Id.* ¶ 49.)  When returning the inmate to his cell, the inmate is placed inside

22   the cell and the cell door is shut while the inmate is still fully restrained.  (*Id.* ¶ 50.)

23   Only once the cell door is shut is the inmate directed to again place his hands in the trap

24   so that the restraints can be removed.  (*Id.* ¶ 51.)

25        On August 4, 2021 the area where inmate Miller was housed was being painted.

26   (DSOF ¶ 52.)  Inmates in the area were given the option to go to outside enclosures

27   during the time their housing area was being painted.  (*Id.* ¶ 53.)  Miller was one inmate

28   who decided to remain outside while the area was painted.  (*Id.* ¶ 54.)  When the

1   painting was complete Defendant Gordon escorted Miller back to his cell.  (*Id.* ¶ 55.)

2   Miller was cooperative and did not show any signs of agitation, anger, or give any other

3   indication he was upset for any reason.  (*Id.* ¶ 56.)   The escort to his cell was entirely

4   without issue.   (*Id.* ¶ 57.)   When Defendant Gordon returned Miller to his cell, he

5   entered his cell restrained where his cellmate, inmate Fabian Cortez-Gastelum #178673

6   was also present.  (*Id.* ¶ 58.)   Before removing Miller's restraints Defendant Gordon

7   closed the cell door completely.  (*Id.* ¶ 59.)   Defendant Gordon then removed Miller's

8   restraints through the trap.   (*Id.* ¶ 60.)   Miller immediately began to assault Cortez-

9   Gastelum.   (*Id.* ¶ 61.)   Both Miller and Cortez-Gastelum engaged in mutual combat.

10  (*Id.* ¶ 62.)    Defendant Gordon immediately directed the inmates to stop fighting.  (*Id.* ¶

11  63.)   The inmates did not comply with Defendant Gordon's verbal directives.   (*Id.* ¶

12  64.)   Defendant Gordon initiated the Incident Command System ("ICS") pursuant to

13  Department Order 706.   (*Id.* ¶ 65.)   Defendant Gordon again clearly directed the

14  inmates to stop and warned that he would deploy my oleoresin capsicum spray ("OC or

15  pepper spray") if they did not comply.  (*Id.* ¶ 66.)   The inmates continued to fight so

16  Defendant Gordon deployed a 1-2 second burst of OC spray into the cell through the

17  trap.   (*Id.* ¶ 67.)   Defendant Gordon again gave the inmates verbal directives to stop

18  fighting but they continued to fight.  (*Id.* ¶ 68.)   Defendant Gordon again deployed a 1-

19  2 second burst of OC spray into the cell through the trap.  (*Id.* ¶ 69.)

20       At this time inmate Miller stopped the assault and complied with directives.

21  (DSOF ¶ 70.)   Sergeant Castillo then arrived to the cell front and assumed command.

22  (*Id.* ¶ 75.)   At this time CO IIs Letso and Dennis also arrived onsite.  (*Id.* ¶ 76.)   CO II

23  Dennis relieved Defendant Gordon of his duties and placed upper restraints on Inmate

24  Cortez-Gastelum and Inmate Miller.   (*Id.* ¶ 77.)   Once both inmates were restrained the

25  cell was accessed and CO II Letsos escorted Inmate Cortez-Gastelum to the health unit.

26  (*Id.* ¶ 78.)   CO II Dennis placed Inmate Miller into the transport chair, secured the

27  straps to the chair, and then transported him to the health unit.  (*Id.* ¶ 79.)   At no time

28  did Defendant Gordon, or any other correctional staff, strike inmate Miller in any way.

1    (*Id.* ¶ 80.)  It would have physically impossible for Defendant Gordon to strike inmate

2    Miller to stop his fight with inmate Cortez-Gastelum because their cell door was closed

3    the entire time they were fighting.  (*Id.* ¶ 81.)  Once the cell door was opened both

4    inmates were cooperative and had been subdued by the effects of the OC spray and

5    therefore no correctional staff, including Defendant Gordon, used any additional force

6    on either inmate.  (*Id.* ¶ 82.)  Defendant Gordon did not observe inmate Miller to be

7    significantly injured and never saw him lose consciousness at any time.  (*Id.* ¶ 83.)

8    Defendant Gordon did not have any involvement in escorting inmate Miller to his

9    medical evaluation, the medical holding enclosure, or his new housing location that

10   day.  (*Id.* ¶ 84.)

11   **III.    Legal Analysis.**

12         **A.    Summary Judgment Standard.**

13         A court must grant summary judgment "if the movant shows that there is no

14   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

15   of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of presenting

16   the basis for its motion and identifying those portions of the record, together with

17   affidavits, if any, that it believes demonstrate the absence of a genuine issue of material

18   fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the movant meets its initial

19   responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a

20   factual dispute and that the fact in contention is material, i.e., a fact that might affect the

21   outcome of the suit under the governing law, and that the dispute is genuine.  *Anderson*

22   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Mere allegation or speculation

23   cannot create a genuine dispute.  *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995).

24         **B.    Miller Did Not Exhaust His Administrative Remedies.**

25                **1.    Exhaustion Standard.**

26         Under the PLRA, a prisoner must exhaust "available" administrative remedies

27   before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*,

28   449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir.

2005).  The PLRA requires "proper" exhaustion of administrative remedies, which is only satisfied through "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Specifically, the PLRA mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  An action is "brought" by a prisoner when he submits it to the court, and at that point, the prisoner must have entirely exhausted the available administrative remedies.  *Vaden v. Summerhill*, 449 F.3d 1047, 1050-51 (9th Cir. 2006).

A defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014).  *See also Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process).  Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172.  The ultimate burden, however, rests with the defendant.  *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust.  *Id*. at 1166, 1168.  *See also* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge.  *Albino*, 747 F.3d at 1170-71.  A plaintiff is not entitled

1   to a jury trial on the issue of exhaustion. *Id.* But if a court finds that the prisoner

2   exhausted administrative remedies, that administrative remedies were not available, or

3   that the failure to exhaust administrative remedies should be excused, the case proceeds

4   on the merits. *Id*. at 1171.

5
        **2.      Although administrative remedies were available to him, Miller**
6             **failed to exhaust those available administrative remedies.**

7        ADCRR has established an Inmate Grievance Procedure that inmates may use to

8   seek redress of issues relating to ADCRR's staff or conditions of confinement. (DSOF

9   at ¶ 2.) "Inmates may utilize the Inmate Grievance Procedure regardless of their

10  disciplinary status, housing location, or classification." (*Id.* ¶ 4.) Therefore, the Inmate

11  Grievance Procedure was available to Miller.

12       The processing of a standard, non-medical, inmate grievance under the ADCRR's

13  Inmate Grievance System generally works as follows: (1) the inmate attempts to resolve

14  the complaint through informal means by discussing the issue with staff in the area most

15  responsible for the complaint; (2) if the inmate is unable to resolve the complaint

16  through such discussions, he must submit a written Informal Complaint to the

17  Correctional Officer ("CO") III assigned to his unit "within ten workdays from the date

18  of the action that caused the complaint"; (3) the CO III will informally investigate and

19  attempt to resolve the issue presented in the Informal Complaint and provide the inmate

20  with a written response; (4) if dissatisfied with the CO III's response to his Informal

21  Complaint, or if the CO III fails to timely respond, the inmate must submit a Formal

22  Grievance to the Grievance Coordinator who will log and investigate the issue raised in

23  the Formal Grievance; (5) within fifteen work days after receipt of the Formal

24  Grievance, the Deputy Warden will provide the inmate with a written response to the

25  Formal Grievance that includes the Deputy Warden's decision and supporting rationale

26  for the decision; (6) if dissatisfied with the Deputy Warden's decision, the inmate must

27  submit an Inmate Grievance Appeal to the Grievance Coordinator who will log, process,

28  and forward the Inmate Grievance Appeal documents to the ADCRR Central Office

Appeals Officer; (7) within 30 days of receipt of the Inmate Grievance Appeal, the Central Office Appeals Officer prepares a response and submits it to the Director for approval and signature by the Director or his delegate.  (DSOF ¶¶ 11-24.)

An inmate's appeal to the ADCRR Director constitutes the final step of ADCRR's Inmate Grievance Procedure, thus exhausting the available administrative remedies for inmate non-medical grievances.  (DSOF ¶ 25.)  The CO IV Grievance Coordinator at each unit and Appeals Officer at the Central Office shall maintain all Inmate Grievance records to include "unprocessed grievances" in a confidential and secure storage area.  (*Id.* ¶ 26.)  Miller did not comply with ADCRR's grievance procedure and therefore failed to properly exhaust his administrative remedies before he filed his lawsuit.  ADCRR's grievance files and logs from January 2021 through November 2021 were reviewed regarding Miller's allegations that staff used excessive force against him on August 4, 2021.  (*Id.* at ¶¶ 30-33.)  The ADCRR Central Office grievance records indicate that no grievance appeals were submitted by Mr. Miller during the time period in question.  (*Id.* ¶ 32.)  The grievance logs indicate Mr. Miller submitted one informal complaint, Grievance case #21-033361, which was initiated by Mr. Miller on September 10, 2021 and alleged excessive force.  (*Id.* ¶ 34.) Grievance case #21-033361 was unprocessed because Miller submitted it past the allotted time frame.  (*Id.* ¶ 35.)  Since Miller submitted the grievance outside of the time frames required he did not comply with the ADCRR's grievance procedure and did not exhaust his administrative remedies.  (*Id.* ¶ 36.)

If Miller brought any grievances between January 2021 through November 2021 regarding his allegations that staff used excessive force against him on August 4, 2021, he failed to submit them within the timelines required by DO 802 and therefore he failed to exhaust his administrative remedies.  (DSOF ¶ 36.)  Accordingly, summary judgment should be granted to Defendants.

**C.    Even If Miller Did Exhaust, Defendant Gordon's Actions Did Not Implicate The Eighth Amendment.**

**1.    Excessive Force Standard.**

The Eighth Amendment provides the source for "substantive protection to convicted prisoners" alleging that they are the victims of excessive force. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). The Eighth Amendment prohibits cruel and unusual punishment, "which includes the unnecessary and wanton infliction of pain by prison officials." U.S. Const. Amend. VIII.; *see also Rhodes v. Chapman,* 452 U.S. 337, 345-46 (1981); *Whitley,* 475 U.S. at 319. The Eighth Amendment both restrains prison officials from applying excessive force against inmates, *Hudson v. McMillian,* 503 U.S. 1, 5 (1992), and it imposes affirmative duties on prison officials to provide humane conditions of confinement, *Farmer v. Brennan,* 511 U.S. 825, 832-33 (1994).

## 2. Defendant Gordon applied force in a good faith effort to restore discipline, not "maliciously or sadistically."

"Where a prison security measure is undertaken ostensibly for the protection of prison officials and the inmate population, force is deemed legitimate as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically for the very purpose of causing harm.'" *Jeffers v. Gomez*, 267 F.3d 895, 911 (9th Cir. 2001) quoting *Whitley,* 475 U.S. at 320-21.   In order to make such determination, the Ninth Circuit has "identified five factors set forth in *Hudson* to be considered ... '(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.'" *Furnace v. Sullivan*, 705 F.3d 1021, 1028–29 (9th Cir. 2013), quoting *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003); *see Whitley*, 475 U.S. at 321.

Here, each of the *Hudson* factors is in favor of Defendant Gordon because he was legitimately responding to an inmate who was fighting with his cellmate. To the extent that Defendant Gordon deployed force, he did so in a good faith effort to restore discipline and alleviate a threat to the safety of others.

Miller was seen by medical on August 4, 2021.  (DSOF ¶ 85.)  The medical provider noted that "P[atien]t has little to no visible injuries."  (*Id. ¶* 86.)  No injuries

were noted in the assessment.  (*Id.* ¶ 87.)  Miller was seen by medical again on August 7, 2021, when he complained of problems hearing in his right ear.  (*Id.* ¶ 88.)  The medical provider noted that there were "no signs of trauma noted during encounter." (*Id.* ¶ 89.)  Miller was seen at the clinic for evaluation of ear ringing and difficulty hearing on August 21, 2021.  (*Id.* ¶ 90.)  The medical provider noted "no gross deformity of external ear, tm intact, ear canals clear, gross hearing intact."  (*Id.* ¶ 91.) Based on the observations of medical providers over several days Miller suffered no significant injury.  Therefore the first *Hudson* factor is in favor of Defendant Gordon.

There was also a clear need to deploy at least some force to stop Miller from fighting with his cellmate.  Defendant Gordon determined it was necessary to deploy his OC spray in order to stop the fight because neither inmate had responded to his clear verbal directives to stop fighting and allowing the fight to continue placed both inmates at risk of physical harm.  (DSOF ¶ 71.)  Given that the inmates were in the cell with the cell door shut, Defendant Gordon determined that OC spray was the best option available to regain compliance.  (*Id.* ¶ 72.)  Entering the cell without support from correctional staff would have placed Defendant Gordon and the inmates at risk of further harm because Defendant Gordon could have been involved in the fight.  (*Id.* ¶ 73.)

Defendant Gordon's actions also show that he attempted to temper the amount of force needed to regain control.  When Defendant Gordon saw the fight begin he immediately directed the inmates to stop fighting.  (DSOF ¶ 63.)  The inmates did not comply with his verbal directives.  (*Id.* ¶ 64.)  Defendant Gordon then initiated the Incident Command System ("ICS") pursuant to Department Order 706.  (*Id.* ¶ 65.) Defendant Gordon again clearly directed the inmates to stop and warned that he would deploy his oleoresin capsicum spray ("OC or pepper spray") if they did not comply.  (*Id.* ¶ 66.)  The inmates continued to fight so Defendant Gordon deployed a 1-2 second burst of OC spray into the cell through the trap.  (*Id.* ¶ 67.)  Defendant Gordon then again gave the inmates verbal directives to stop fighting but they continued to fight.  (*Id.* ¶ 68.) Finally, Defendant Gordon deployed a second 1-2 second burst of OC spray into the cell

through the trap.  (*Id.* ¶ 69.)  Deployment of more significant force was unnecessary because after two sprays of the OC the inmates stopped fighting and became compliant. (*Id.* ¶ 74.)   The amount of force used given the situation and Defendants Gordon's efforts to get the inmates to stop before each deployment of OC spray shows that the remaining four *Hudson* factors are also in favor of Defendant Gordon.

Applying force to stop two inmates from continuing a physical altercation is the very definition of applying force  'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically for the very purpose of causing harm.'"  *Jeffers*, 267 F.3d at 911.  Summary judgment should be granted to Defendant Gordon.

**IV.      Conclusion.**

For the reasons stated herein, the Defendant's Motion for Summary Judgment should be granted and Miller's Complaint should be dismissed with prejudice in its entirety.

RESPECTFULLY SUBMITTED this 14th day of November, 2022.

MARK BRNOVICH
Attorney General


s/ Patrick J. Boyle
Patrick J. Boyle
Assistant Attorneys General
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of November, 2022, I electronically transmitted the attached document to the Clerk of Court using the CM/ECF System.

I also certify that on the same date, the attached document and Notice of Electronic Filing was deposited for mailing to the following, who is not a registered participant of the CM/ECF System:

Fredrick A. Miller, #262220
ASPC Tucson Rincon Unit
P O Box 24403
Tucson, AZ  85734
*Plaintiff Pro Se*


s/ M. Cruz
Legal Secretary to Patrick J. Boyle
#10775704
LMS22-0056