SM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frederick Angus Miller, Jr., <br> Plaintiff, <br> v. <br> Unknown Gordan, et al., <br> Defendants. | No. CV 21-01867-PHX-DGC (ESW) <br><br> **ORDER** |

Plaintiff Frederick Angus Miller, Jr., who is currently confined in Arizona State Prison Complex (ASPC)-Tucson, Rincon Unit, brought this civil rights case pursuant to 42 U.S.C. § 1983. (Doc. 1.) Defendant moves for summary judgment, and Plaintiff opposes.[1] (Docs. 83, 90.) Defendant filed a Reply (Doc. 91), and the Motion for Summary Judgment is ripe for ruling.

**I.  Background**

Plaintiff sues Corrections Officer (CO) II Matthew Gordon. (Doc. 1.)[2] Plaintiff claims that, on August 4, 2021, while he was housed at the ASPC-Eyman, Special Management Unit (SMU), Defendant Gordon was escorting Plaintiff back to his cell after Plaintiff had been temporarily moved to a recreation cage while his pod was being painted. (*Id.* at 3.) Plaintiff alleges that after he had been cuffed and led out of the recreation cage,

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 85.)

[2] Plaintiff spelled Defendant's surname "Gordan" in the Complaint, but the Court will adopt the spelling "Gordon" used in Defendant's pleadings.

Defendant Gordon went behind Plaintiff to close the recreation cage and assaulted Plaintiff by hitting him from behind on the right side of his head. (*Id.*) Plaintiff claims he was knocked unconscious, awoke in the medical department, strapped to a chair without his clothing, and was released after he was evaluated and his vitals were taken. (*Id.*) Plaintiff claims he returned to the medical department three days later and complained of headaches, seeing white spots, and experiencing hearing loss. (*Id.*) Plaintiff claims he saw an audiologist. (*Id.*) Plaintiff alleges that he has visual impairment and wears hearing aids due to permanent hearing loss from the assault. (*Id.*)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment excessive force claim against Defendant Gordon and directed him to answer. (Doc. 7.) Defendant Gordon now moves for summary judgment and argues that Plaintiff failed to exhaust his claim and that Defendant Gordon's actions did not violate the Eighth Amendment. (Doc. 83.)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law) and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The

nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968), but it must "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court must believe the nonmovant's evidence and draw all inferences in his favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Exhaustion

### A. Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner to either demonstrate that he exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed

in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

If summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted administrative remedies, that administrative remedies were not available, or that the failure to exhaust should be excused, the case proceeds to the merits. *Id.* at 1171.

**B.     Arizona Department of Corrections (ADC) Grievance Procedure**

ADC Department Order 802 ("DO 802"), *Inmate Grievance Procedure*, (eff. Oct. 16, 2016), governs the prisoner grievance procedure. (Def.'s Statement of Facts, Doc. 84 ¶ 1.) Prisoners receive a written and oral explanation of the Inmate Grievance Procedure at intake and as part of the orientation process in any subsequent facility. (*Id.* ¶ 10.)

At the first step of the grievance process, a prisoner must attempt to resolve his or her complaint through informal means, including, but not limited to, discussion with staff in the area most responsible for the complaint or through the submission of an Inmate Informal Complaint Resolution. (*Id.* ¶ 11.) If the complaint cannot be resolved informally, the prisoner may submit an Informal Complaint on an Inmate Informal Complaint Resolution form to the CO III in the prisoners' respective unit. (*Id.* ¶ 12.) The Informal Complaint must be submitted within 10 workdays from the date of the action that caused the complaint. (*Id.* ¶ 13.) The CO III attempts to investigate and resolve the complaint informally and provides a response within 15 workdays of its receipt. (*Id.*)

At the second step, a prisoner may file a Formal Grievance if the prisoner is dissatisfied with the Inmate Informal Complaint Response. (*Id.* ¶ 15.) If a prisoner cannot resolve a complaint informally, the prisoner may submit a Formal Grievance to the unit CO IV Grievance Coordinator within five workdays from receipt of a response from the CO III. (*Id.* ¶ 16.) The unit CO IV Grievance Coordinator then logs and assigns a number to the grievance, using the Unit Coordinator Grievance Log. (*Id.* ¶ 19.) Within 15

workdays following the receipt of the formal grievance, the Deputy Warden issues a written response to the prisoner. (*Id.* ¶ 20.)

Finally, if the prisoner receives an unfavorable response from the Deputy Warden, the prisoner may appeal the response to the Director within five workdays of receipt of the Formal Inmate Grievance Response from the Deputy Warden. (*Id.* ¶ 21.) The prisoner submits the Appeal to the CO IV Grievance Coordinator who logs, processes, and forwards all documents to the Central Office Appeals Officer within five workdays of receiving the Inmate Grievance Appeal from the prisoner. (*Id.* ¶ 22.) Within 30 calendar days, the Central Office Appeals Officer prepares a response and submits it to the Director or Director's designee for signature. (*Id.* ¶ 24.) The Director's response is final and constitutes exhaustion of all remedies with ADCRR for standard grievances. (*Id.*)

A prisoner who does not receive a response within the time period specified may proceed to the next stage as if the prisoner had received a response. (*Id.* ¶ 7.) The time to proceed to the next stage begins to run the day after the response was due. (*Id.* ¶ 8.)

### C. Plaintiff's Relevant Grievance Record

Administrative Services Officer II Janah Barreras reviewed the grievance appeal log and the files at the ADC's Central Office for any formal grievance appeals submitted to the Director's level by Plaintiff between January 2021 and November 2021. (*Id.* ¶ 30.) Barreras's job duties include responding to and tracking nonmedical or "standard" grievance appeals to the ADC Director or Director's level, as well as maintaining a computerized Inmate Grievance Appeal Log of such appeals. (*Id.* ¶ 31.) The log is maintained at ADC's Central Office in numerical order and is also accessible by grievance case number and by inmate name and number. (*Id.*)

Barreras's review of the relevant records did not return any grievance appeals submitted by Plaintiff during this time period. (*Id.* ¶ 32.)

Barreras also reviewed the grievance logs from the SMU for August and September 2021, including the unprocessed grievance logs. (*Id.* ¶¶ 33, 37.) The grievance logs indicate Plaintiff submitted one informal complaint, Grievance case #21-033361, on

September 10, 2021, in which he alleged that he was subjected to excessive force on August 4, 2021. (*Id.* ¶ 34; Doc. 90 at 10.) The informal complaint was returned unprocessed because Plaintiff submitted it past the permitted time frame (10 workdays after the incident). (Doc. 84 ¶ 35; Doc. 90 at 11.) The unprocessed logs also indicate that Plaintiff submitted an unprocessed grievance related to missing property on August 19, 2021. (Doc. 84 ¶ 39; Doc. 84-3 at 3; Doc. 90 at 21.) Plaintiff contends that this "grievance was not about loss of property[,] it includes assault by an officer." (Doc. 90 at 2.)

On September 25, 2021, Plaintiff submitted a formal grievance in case #21-033361 regarding Defendant's alleged use of excessive force on August 4, 2021. (Doc. 90 at 12–15.) The formal grievance was returned unprocessed on September 30, 2021 with a note that it was "not within policy" because "Once the Informal Resolution, Grievance or Appeal paperwork has been deemed 'Unprocessed' by the Grievance Coordinator, the complaint is considered rejected as per policy. You cannot go to the next level of the grievance process." (*Id.* at 16.)

On October 3, 2021, Plaintiff submitted an Inmate Grievance Appeal in case #21-033361 regarding the alleged use of excessive force. (*Id.* at 18.) The appeal was returned unprocessed on October 4, 2021 for the same reason the formal grievance was returned. (*Id.* at 19.)

### D. Discussion

Defendant has met his initial burden of showing that there was an administrative remedy available to Plaintiff, as outlined in DO 802, and that Plaintiff did not complete this process with respect to his Eighth Amendment claim. Accordingly, the burden shifts to Plaintiff to either show that he exhausted the available remedies or that the remedy was effectively unavailable to him. *Albino*, 747 F.3d at 1172.

Plaintiff asserts that "while making efforts to eng[]age in a grievance process the Florence-Eyman-S.M.U. I officers didn't provide the form," "rendering the grievance process unavailable." (Doc. 90 at 2.) Plaintiff states that "after 3 weeks totaling over 30 days . . . the forms were provided . . . 34 days later." (*Id.*) Plaintiff also states that he "used

the (Inmate-Letter) tablet system" on August 5 and 25, 2021 and that he "continued to request [grievance] forms [from staff] and [he] was continuously refused by staff until 9-11-21." (*Id.* at 3.) Plaintiff asserts that from August 4, 2021 until September 10, 2021, "the Florence-Eyman-SMU-I staff refused to give [him] paperwork to start [his] complaint." (*Id.*) Plaintiff states that he "continued to request DO 802 forms and [he] was continuously refused by staff . . . until 9-11-21" when CO III Kiss gave Plaintiff the necessary grievance forms. (*Id.*) Plaintiff asserts that he initiated, and completed, the grievance process concerning his claim as soon as he received these documents.

As stated, the PLRA exhaustion provision requires proper exhaustion of only "available" administrative remedies. *Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010); *see Brown*, 422 F.3d at 935. Exhaustion is not required when circumstances render administrative remedies "effectively unavailable." *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see Sapp*, 623 F.3d at 823. The Ninth Circuit has held that a prisoner is excused from the exhaustion requirement where he does not have access to the necessary forms to timely file a grievance. *Marella v. Terhune*, 568 F.3d 1024, 1027–28 (9th Cir. 2009) (per curiam).

Defendant argues that Plaintiff was able to file an informal complaint on August 19, 2021 as proof that he had access to grievance documents prior to September 10, 2021. But Defendant did not provide a copy of this informal complaint and it is unknown when this form was actually given to Plaintiff. Moreover, Plaintiff asserts that this informal complaint included allegations about the alleged assault – an assertion the Court cannot confirm or reject because Defendants has failed to produce the actual grievance form. No reason was provided in the log for why this informal complaint was returned unprocessed.

Defendant presents no evidence to refute Plaintiff's assertion that he repeatedly requested grievance forms without success. Because Plaintiff was in the SMU, which largely requires Plaintiff to be confined to his cell with limited freedom to move about the prison, he presumably could have obtained the forms only by requesting them and having them delivered to his cell. And even if he finally obtained a grievance form by August 19,

2021 as Defendant asserts, his informal complaint about the August 4, 2021 incident would have been too late. It was due no later than August 18, 2021, ten workdays after the alleged assault. His complaint would have been rejected as untimely, as were his subsequent efforts at appeal.

The record shows that Plaintiff attempted two appeals to complete the grievance process for the August 4, 2021 alleged assault. And as noted, Defendant has presented no evidence to refute Plaintiff's claim that he repeatedly requested grievance forms after the assault, without success. On this record, Plaintiff has shown that the necessary grievance forms were not available to exhaust his claim in a timely fashion. Because administrative remedies were effectively not available, the failure to exhaust is excused. *See id.*; *Marella*, 568 F.3d at 1027 (where a prisoner does not have access to the necessary forms and is unable to file a grievance, remedies are unavailable). Accordingly, Defendant's Motion for Summary Judgment will be denied on the issue of exhaustion, the Court finds in favor of Plaintiff on exhaustion, and the Court will consider Defendant's motion on the merits.

## IV. Excessive Force

### A. Legal Standard

Excessive force violates a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Force is constitutional if it is used in a good faith effort to keep or restore discipline, but unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Not "every malevolent touch by a prison guard gives rise to a federal cause of action," and if the use of force is not "repugnant to the conscience of mankind" it does not offend the Constitution. *Hudson v. McMillan*, 503 U.S. 1, 9-10 (1992).

Courts consider five factors in determining whether a defendant's use of force was sadistic and malicious for the purpose of causing harm: (1) the extent of the injury, (2) the need to use the force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper

the severity" of the force. *Id.* at 7 (citing *Whitley*, 475 U.S. at 321). When reviewing these *Whitley* factors, the court must remember that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

**B.     Relevant Facts**

It is undisputed that on August 4, 2021, Plaintiff's housing area was being painted, so Plaintiff and other prisoners housed with him were placed in outside enclosures while the painting was completed. (Def.'s Statement of Facts, Doc. 84 ¶¶ 52–53; Doc. 1 at 3.) The parties dispute the sequence of events that took place when Plaintiff was being escorted back to his cell once the painting was completed.

According to Plaintiff, Defendant escorted Plaintiff back to his cell. (Doc. 1 at 3.) Plaintiff's hands were cuffed behind his back. (*Id.*) "After being cuffed up and lead out of the rec[reation] cage . . . [Plaintiff] was hit on the right side of the head from behind after [Defendant] Gordon went behind [Plaintiff] to close the rec[reation] cage." (*Id.*) Plaintiff was knocked unconscious. (*Id.*)

Defendant agrees he escorted Plaintiff back to his cell. (Doc. 84 ¶ 55.) During the escort, Defendants asserts, Plaintiff "was cooperative and did not show any signs of agitation, anger, or give any other indication he was upset for any reason. . . . The escort to his cell was entirely without issue." (*Id.* ¶¶ 56–57.) Plaintiff entered the cell in restraints. Plaintiff's cellmate, Fabian Cortez-Gastelum, was inside the cell. (Doc. 84 ¶ 58.) Before removing Plaintiff's restraints, Defendant closed the cell door completely. (Doc. 84 ¶ 59.) Defendant removed Plaintiff's handcuffs through the trap in the cell door. (*Id.* ¶ 60.) Plaintiff immediately began to assault Cortez-Gastelum, and Cortez-Gastelum fought back. (*Id.* ¶¶ 61, 62.) Defendant ordered the prisoners to stop fighting, but they did not comply with his verbal commands. (*Id.* ¶¶ 63, 64.) Defendant initiated an Incident Command System and repeated verbal commands for the prisoners to stop fighting, warning them that he would deploy his pepper spray if they did not comply. (*Id.* ¶¶ 65, 66.) The prisoners

continued to fight, so Defendant deployed a 1–2 second burst of pepper spray into the cell through the trap. (*Id.* ¶ 67.) Defendant again ordered the prisoners to stop fighting, but they continued to fight, so Defendant deployed another 1–2 burst of pepper spray through the trap. (*Id.* ¶¶ 68, 69.) At this time, Plaintiff stopped fighting and complied with Defendant's commands. (*Id.* ¶ 70.) Sergeant Castillo arrived and assumed command. (*Id.* ¶ 75.) CO II's Letso and Dennis also arrived at the scene, and CO II Dennis relieved Defendant of his duties and placed upper restraints on Plaintiff and Cortez-Gastelum. (*Id.* ¶¶ 76, 77.) Once both prisoners were restrained, CO II Letsos escorted Cortez-Gastelum to the health unit and CO II Dennis placed Plaintiff into the transport chair, secured the straps to the chair, and transported Plaintiff to the health unit. (*Id.* ¶¶ 78, 79.) Defendant denies that he, or any other correctional staff, struck Plaintiff at any point. (*Id.* ¶ 80.) Defendant asserts that once the cell door was opened, both prisoners were cooperative and had been subdued by the effects of the pepper spray. No correctional staff, including Defendant, used any additional force on either prisoner. (*Id.* ¶ 82.)

Plaintiff was seen by medical the same day and the provider noted that Plaintiff had been attacked by his "cellie" and had "little to no visible injuries." No injuries were noted in the assessment. (*Id.* ¶¶ 85, 86, 87; Doc. 84-6 at 11.) Plaintiff was seen by medical again on August 7, 2021 for complaints of hearing problems in his right ear after being hit by staff. (Doc. 84 ¶ 88; Doc. 84-6 at 5.) The provider noted that there were "no signs of trauma noted during encounter." (Doc. 84 ¶ 89.) Plaintiff was seen at the clinic for evaluation of ear ringing and difficulty hearing on August 21, 2021, and the provider noted "no gross deformity of external ear, tm [tympanic membrane] intact, ear canals clear, gross hearing intact." (*Id.* ¶¶ 90, 91.) The provider noted that Plaintiff would follow up "with onsite audiology or nursing for audiometry." (Doc. 84-6 at 4.)

Plaintiff saw the onsite audiologist on September 10, 2021 for audiometry testing. (Doc. 90 at 27.) The results showed "profound" hearing loss in the right ear and "moderate" loss in the left ear due to "[h]ead trauma." (Doc. 90 at 30.) Plaintiff was issued left and right hearing aids. (*Id.* at 29.)

**C. Dispute of Fact**

Although the Court normally would apply the *Whitley* factors in assessing whether there was an unconstitutional use of force, in this case there is a clear factual dispute as to whether there was any use of force that could have caused Plaintiff's alleged hearing loss. Defendant asserts that pepper spray was used to break up the fight between Plaintiff and his cellmate, but that no other physical force was used. Plaintiff maintains that Defendant hit him from behind while his hands were cuffed behind his back. Plaintiff contends that the disciplinary and use-of-force reports submitted by Defendant and other staff members have been fabricated.

If a jury believes Plaintiff's version of events, the *Whitley* factors almost certainly will show a violation of his constitutional rights. If a jury believes Defendant, then no improper use of force caused Plaintiff's hearing loss. This factual dispute clearly must be resolved by a jury, not by the Court on summary judgment.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendant's Motion for Summary Judgment (Doc. 83).

(2) Summary judgment is granted to Plaintiff on the issue of exhaustion.

(3) Defendant's Motion for Summary Judgment (Doc. 83) is **denied**.

(4) This action is referred by random lot to Magistrate Judge Deborah M. Fine to conduct a settlement conference.

(5) Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Fine's chambers at (602) 322-7630 within 14 days to schedule a date for the settlement conference.

(6) The parties must file a joint status report **within thirty (30) days** following the settlement conference, if it is not successful, proposing dates to file their joint proposed pretrial order.

Dated this 4th day of May, 2023.

David G. Campbell
Senior United States District Judge